Argued April 10, affirmed April 30, rehearing allowed June 25, argued
on rehearing July 17, former opinion adhered to September 10,
1918.

# ROWE v. FREEMAN.*

(172 Pac. 508; 174 Pac. 727.)

**Deeds—Understanding of Grantor—Sufficiency of Evidence.**

1. In suit by a daughter to cancel her mother's deed to a son on
the ground of undue influence, evidence *held* to show that the mother
understood the purport of her deed when she executed it, and that she
realized thereafter that her son had title to the property.

**Appeal and Error—Review—Findings.**

2. Some weight must be given to the fact that the lower court
which saw the witnesses determined the issues in favor of defendants.

**Deeds—Trust Relationship—Burden of Proof.**

3. If a fiduciary relation existed between mother and son, in suit
by a daughter to cancel the mother's deed to the son the burden of
proof devolved on the son to sustain the transaction.

[As to presumption and burden of proof of undue influence in
conveyance by parent and child, see note in Ann. Cas. 1915D, 711.]

**Trusts—Conveyance to Trustee—Independent Advice.**

4. The principle that a deed from *cestui que trust* to trustee will be
upheld only when the former has acted under independent advice,
applies only to cases whereby ill health, mental infirmity, immaturity
or otherwise, the party whose deed is attacked is one not likely to act
wisely without disinterested advice, for a party of normal mentality
is entitled to dispose of his own as he sees fit.

**Deeds—Trust Relationship—Evidence.**

5. In a daughter's suit to cancel a deed executed by her mother
to a son on the ground of undue influence and trust relationship, that
the mother executed a power of attorney to the son was a circum-
stance to be given weight in determining whether a trust relation
existed between them, but the circumstance does not, of itself, estab-
lish a fiduciary relation.

**Deeds — Conveyance to Trustee — Independent Advice — Burden of
Proof.**

6. Where a mother constituted her son her attorney in fact by
giving him power of attorney, but the only use he made of such power
was the ministerial act of withdrawing a deed to the mother's land

---

*As to independent advice as condition of valid gift between parties
occupying confidential relations, see note in 16 L. R. A. (N. S.) 1087.

The question of presumption and burden of proof as to undue influ-
ence respecting gifts *inter vivos* from parent to child is discussed in
note in 35 L. R. A. (N. S.) 944.                              REPORTER.

deposited in escrow, the power of attorney did not create such relation of trust between the mother and son that in a daughter's suit against him to cancel his mother's deed to him, executed after revocation of the power, he had the burden to prove his mother acted under independent advice.

Deeds—Conveyance to Trustee—Independent Advice—Termination of Relation.

7. If son's power of attorney from his mother created a relationship of trust between them, laying upon him the burden, in his sister's suit to cancel his mother's deed to him, to uphold the good faith of the transaction, the termination of the relation by revocation of the power of attorney destroyed the son's disqualification to deal with his mother unadvised.

Deeds—"Fiduciary Relation"—Absence of Trust or Agency.

8. Fiduciary relationship may exist in the absence of a trust or agency, being found, with its accompanying burdens and disqualifications, wherever there is confidence reposed on one side and resulting superiority and influence on the other.

Deeds—Fiduciary Relationship—Parent and Child.

9. The relation of parent and child, accompanied by the affection and companionship incident thereto, does not make the child a fiduciary within the rule casting the burden upon him to justify a deed in his favor from his parent.

Deeds—Undue Influence—Burden of Proof.

10. In a daughter's suit to cancel her mother's deed to a son, where the daughter failed to show the existence of a fiduciary relationship between mother and son, the burden of proof was on her to establish the undue influence and other matters relied on to set aside the deed.

Deeds—Undue Influence—Execution on Request.

11. The execution of a deed at the suggestion or request of the grantee, the grantor, his mother, reserving a life estate and revenues adequate to her necessities, did not constitute undue influence nor vitiate the conveyance.

Deeds—Deed from Parent to Child—Presumption of Invalidity.

12. No presumption of invalidity attaches to a deed from mother to son wherein the mother reserves a life estate and revenues adequate to her necessities, though executed without monetary consideration at the suggestion or request of the son; the mother being mentally competent and no trust relation existing.

ON REHEARING.

Deeds—Undue Influence—Fiduciary Relation—Termination.

13. On the issue of undue influence in procurement of deed from mother to son, a power of attorney from her to him, to enable him to obtain a paper put by her in escrow, and used only for that purpose, was without value as conclusive evidence of trust relation between them, where it was revoked before execution of deed.

Deeds—Fiduciary Relation—Independent Advice.
14. That the grantor has confidence in and trusts the grantee does not make independent advice a *sine qua non* to validity of deed of gift.

Deeds—Deed to Son—Presumption of Validity.
15. Presumptions, under Section 799, subdivisions 1, 19, L. O. L., of innocence of wrong and fairness and regularity of private transactions, *held* to require finding against undue influence in deed to son, with reservation of life estate, only confidence and opportunity appearing; other children being presumptively dead or near death, and testimony of fairness not being met.

From Columbia: JAMES A. EAKIN, Judge.

Department 2.

This is a suit brought to set aside a deed to six hundred and thirty-four acres of land near Scappoose, executed by Bridget M. Freeman in favor of Daniel E. Freeman, February 16, 1912. Plaintiff sues as one of the heirs at law of the grantor, who died intestate October 26, 1912. The deed in question reserved to the grantor a life estate in the property. The deed recites a consideration of one dollar and other valuable considerations, but it is conceded that no money consideration passed at the time of its execution. At the date of the deed Bridget M. Freeman had three children living: plaintiff, the defendant Daniel E. Freeman and Carrie Freeman, who died April 9, 1912. She also had a grandson, Lester Dowling, the child of a deceased daughter. The evidence is in conflict as to the age of Bridget M. Freeman. Plaintiff testifies that she was about eighty and her testimony is corroborated by that of another witness. Daniel E. Freeman testifies that his mother was sixty-eight. Other witnesses think she was about seventy.

The property in question is a dairy farm on which Bridget M. Freeman and her husband, since deceased, had resided prior to 1891. In that year they moved to Portland, leaving the farm in charge of Daniel E. Free-

man and his brother William, who died in 1897. A written lease was given these two sons. William left the farm in 1894 and thereafter the defendants Daniel E. Freeman and Mariah Freeman, his wife, resided on and farmed the property continuously except from 1898 to 1900. Although no written lease was executed subsequent to that above referred to, Daniel E. Freeman paid his mother a rental of $50 a month. This with a small pension she received was adequate to her necessities.

Plaintiff left the home of her parents in 1900. Within the next two years she wrote two letters from Baker City to the defendant Mariah Freeman. She found her way to California and was living at Healdsburg when her mother died in 1912. Except for the two letters above referred to, she had not communicated with the family in any manner since 1900. The testimony as to Lester Dowling is meager, but it sufficiently appears that he also was out of touch with the family.

A son, Jack, died in 1911 and after his death Bridget M. Freeman moved from Portland to Scappoose, remaining there until her death. At the date of the deed in question Carrie Freeman was in the last stages of tuberculosis which took her away less than two months thereafter.

The amended complaint on which the case was tried charges that the defendant Daniel E. Freeman procured the execution of the deed in question with intent to deprive plaintiff of a share of the property of her mother; that the deed was prepared at his instance in the absence of his mother; that the reservation of a life estate therein was for the purpose of plausibly representing to his mother that the instrument was only a lease; that he did so represent and that the deed

was executed by Bridget M. Freeman in the belief that she was executing a lease; that the deed was executed without independent advice as to its purport and without being read to the grantor, who could neither read nor write; that the name of the grantor was written by the defendant Daniel E. Freeman and that the grantor was induced to make her mark thereon "because of her said confidence and trust in her son and by his undue influence and persuasion upon her." Issue is joined on these allegations.

The decree of the lower court was for the defendants and plaintiff appeals.        AFFIRMED.

For appellant there was a brief over the name of *Messrs. Manning, Slater & Leonard,* with an oral argument by *Mr. John Manning* and *Mr. Woodson T. Slater.*

For respondents there was a brief over the names of *Mr. W. A. Harris* and *Messrs. Cake & Cake,* with oral arguments by *Mr. Harris* and *Mr. William M. Cake.*

McCAMANT, J.—1. It appears that Bridget M. Freeman was illiterate, but the preponderance of the evidence is that she was abundantly competent and that she had a mind of her own. She was in normal health when the deed was executed; she died of pneumonia eight months thereafter.

Grant Watts, the notary public who took the acknowledgment of the deed, testifies that he had previously advised Mrs. Freeman to execute a deed to this effect, that on the day when the deed was executed Mrs. Freeman was in her right mind and seemed to know what she was doing.. He further testifies that he read the deed, told Mrs. Freeman that "it was a deed with a life

lease in it''; that he (Watts) wrote Mrs. Freeman's name as a signature and made her mark, while she held the top of the pen.

E. W. Price, one of the subscribing witnesses, corroborates this testimony in part. He says, ''They told me it was a deed to Dan,'' and that this remark was made in the presence of Mrs. Freeman. This was the only real estate which the grantor owned and she must have understood the remark as applicable to the property in question.

A. Bonser testifies that in April, 1912, Mrs. Freeman told him she had conveyed the property to Dan. On May 21, 1912, Mrs. Freeman joined with the defendants in a mortgage of the property to the Investors' Mortgage Security Company Limited. O. M. Washburn, who took her acknowledgment of the mortgage, explained to her that her signature was necessary because of her interest in the place. Mr. Washburn testifies that Mrs. Freeman said she understood the transaction.

On the other hand, Mrs. H. A. Ehlers testifies that in August, 1912, Mrs. Freeman told her: ''Dan has no deed; he has only a lease.'' Whatever the explanation of this testimony, the preponderance of the evidence is to the effect that Mrs. Freeman understood the purport of her deed when she executed it and that she realized several months thereafter that her son Daniel E. had a title to the property.

There is evidence that Mrs. Freeman was dissatisfied with the conduct of the defendant Daniel E., but it nevertheless appears that in the last year of her life he was the only member of the family who saw anything of Mrs. Freeman, except only Carrie Freeman. This daughter died six months before her mother, after a lingering illness, during the latter part of which she

89 Or.—28

was helpless. Mrs. Freeman seems to have doubted whether plaintiff was still alive. In a letter written by plaintiff after the death of her mother she admits that she was at fault in failing to write her mother during the last twelve years of the latter's life. In another letter plaintiff intimates that she had been advised of the death of her brother Jack, who died in 1911, and that of her sister Carrie, who died in April, 1912. Plaintiff sent no message of condolence to her mother on either of these occasions. The excuses offered for this long silence are that Mrs. Freeman was illiterate and that plaintiff's relations with her sister Carrie were not cordial. There is evidence that Mrs. Freeman did not regard these excuses as adequate.

On January 17, 1911, Mrs. Freeman gave a power of attorney to Daniel E. Freeman. This instrument was recorded in the records of Columbia County January 25, 1911. On the advice of counsel who drew the deed in controversy, the power was revoked by Mrs. Freeman immediately prior to the execution of the deed. The powers granted by this instrument were very broad, but it appears by uncontroverted testimony that it was executed in order to empower Daniel E. Freeman to withdraw a deed which his mother had left in escrow with a Portland bank at a time when the sale of the property was contemplated. There is also some testimony that the power of attorney was given with a view to "some road matters down on the farm." This last circumstance explains the fact that the power of attorney was placed of record. It does not appear that the power of attorney was used except for the purpose of withdrawing the deed from the bank.

2. There is testimony to the effect that Daniel E. Freeman, prior to the bringing of this suit, offered plaintiff $10,000 for her interest in the property if she

would wait till he could sell the property. This was in the nature of a compromise offer which was not accepted. Apart from the fact that Daniel E. Freeman denies making the offer, the circumstance is unimportant. This denial is in conflict with the testimony of five witnesses and we cannot doubt that the fact is as contended by plaintiff. In this and in other respects the testimony of Daniel E. Freeman is unsatisfactory, but the controlling facts in the case are established by testimony other than that of this defendant. Some weight must be given to the fact that the lower court which saw the witnesses determined the issues in favor of the defendants: *Scott* v. *Hubbard,* 67 Or. 498, 505 (136 Pac. 653); *Hurlburt* v. *Morris,* 68 Or. 259, 272 (135 Pac. 531); *Goff* v. *Kelsey,* 78 Or. 337, 348 (153 Pac. 103); *Shane* v. *Gordon,* 84 Or. 627, 630 (165 Pac. 1167); *Tucker* v. *Kirkpatrick,* 86 Or. 677, 679 (169 Pac. 117).

3, 4. It is contended by plaintiff that a relation of trust and confidence subsisted between Daniel E. Freeman and his mother and that therefore the burden of proof devolved upon him to sustain the deed made in his favor. It is also contended that in order to sustain the deed it is essential for him to show that in executing the deed his mother acted pursuant to independent advice. If a fiduciary relation existed as contended, the burden of proof devolved on the defendants to sustain the transaction: *Jenkins* v. *Jenkins,* 66 Or. 12, 17 (132 Pac. 542); *Clough* v. *Dawson,* 69 Or. 52, 60 (133 Pac. 645, 138 Pac. 233); *Baber* v. *Caples,* 71 Or. 212, 224 (138 Pac. 472, Ann. Cas. 1916C, 1025). Plaintiff's contention as to the necessity of independent advice finds some support in *Jenkins* v. *Jenkins,* 66 Or. 12 (132 Pac. 542). Plaintiff also cites on this point *Rhodes* v. *Bate,* 1 Ch. App. 252, 257; *Haydock* v. *Haydock's Exrs.,* 34 N. J. Eq. 570, 575 (38 Am. Rep. 385);

*Slack* v. *Rees,* 66 N. J. Eq. 447 (59 Atl. 466, 69 L. R. A. 393); *Post* v. *Hagan,* 71 N. J. Eq. 234 (65 Atl. 1026, 124 Am. St. Rep. 997); *Hensan* v. *Cooksey,* 237 Ill. 620 (86 N. E. 1107, 127 Am. St. Rep. 345). The principle that a deed from *cestui que trust* to trustee will be upheld only when the former has acted under independent advice must be limited in its application to cases where by reason of ill health, mental infirmity, immaturity or otherwise, the party whose deed is attacked is unlikely to act wisely in the premises without disinterested advice. A party of normal mentality is entitled to dispose of his own in such manner as he sees fit: *Carnagie* v. *Diven,* 31 Or. 366, 368 (49 Pac. 891); *Dean* v. *Dean,* 42 Or. 290, 299 (70 Pac. 1039); *Reeder* v. *Reeder,* 50 Or. 204, 206 (91 Pac. 1075); *Deckenbach* v. *Deckenbach,* 65 Or. 160, 165 (130 Pac. 729); *Wade* v. *Northup,* 70 Or. 569, 578 (140 Pac. 451). While courts of equity are vigilant to redress fraud and imposition, the rules adopted for that purpose must not trench on the power of disposition which is incident to the right of private property.

5. Did Daniel E. Freeman sustain a relation of trust to his mother? The chief reliance of plaintiff on this branch of the case is on the power of attorney executed in his favor. We agree with the California Court of Appeals that this is a circumstance to be given weight in the determination of the question: *Nobles* v. *Hutton,* 7 Cal. App. 14 (93 Pac. 289). We also agree with the Pennsylvania Supreme Court that this circumstance does not of itself establish a fiduciary relation: *Crothers* v. *Crothers,* 149 Pa. St. 201, 205, 206 (24 Atl. 190).

The law applicable to the question in dispute is all based on the principle that no man can serve two masters. Where one owes a duty to another, he will not be permitted to take a position in which his interest

conflicts with his duty. He who is obligated to secure a maximum price for property will not be permitted to buy it, because of the conflict between duty and interest created by the purchase. An attorney must give disinterested service to his client, as must an agent to his principal. If, while the relation subsists, the attorney or agent secures an advantage to himself in his dealings with the client or the principal, equity will lay on him the burden of proving the transaction free from fraud and imposition. The purpose of the rule is to insure disinterested service, to protect against the misuse of a position of trust and confidence for purposes of spoliation.

6, 7. As attorney in fact for his mother, the evidence fails to charge Daniel E. Freeman with any such duty as makes the foregoing principle applicable. The only use made of the power of attorney, so far as the record shows, was the ministerial act of withdrawing a deed deposited in escrow. This act was done more than a year prior to the execution of the deed in question. The power of attorney was revoked just prior to the execution of the deed. If the relation had constituted a disqualification, its termination destroyed the disqualification: *O'Reiley* v. *Bevington,* 155 Mass. 72, 76, 77 (29 N. E. 54); *Munn* v. *Burges,* 70 Ill. 604; *Bush* v. *Sherman,* 80 Ill. 160, 171, 172; *Watson* v. *Sherman,* 84 Ill. 263, 266; *Silverthorn* v. *McKinster,* 12 Pa. 67, 71; *First Nat. Bank* v. *Bissell,* 4 Fed. 694, 698 (2 McCrary, 73); *Chatham Bank* v. *McKeen,* 24 Can. Sup. Ct. 348.

8–10. A fiduciary relation may exist in the absence of a trust or agency. It is found with its accompanying burdens and disqualifications wherever there is confidence reposed on one side and resulting superiority and influence on the other: *Walker* v. *Shepard,* 210 Ill. 100 (71 N. E. 422); *Irwin* v. *Sample,* 213 Ill. 160 (72

N. E. 687); 2 Pomeroy's Eq. Jur. (3 ed.), § 956. The ·
evidence indicates that Bridget M. Freeman transacted
very little business. Grant Watts cashed her pension
checks for her. She lived simply at Scappoose on this
pension and the rent paid by Daniel E. Freeman. The
latter visited her from time to time, kept her supplied
with fire wood and ministered to her in other respects
as a son would ordinarily do for his mother. The evi-
dence fails to show that he had an ascendancy over her
mind or that his mother looked to him for counsel in
respect to her property. The relation of parent and
child, accompanied by the affection and the companion-
ship incident thereto, does not make the child a fidu-
ciary within the rule invoked: *Bonsal* v. *Randall,* 192
Mo. 525, 531, 532 (91 S. W. 475, 111 Am. St. Rep. 528);
*Jones* v. *Thomas,* 218 Mo. 508, 536 (117 S. W. 1177);
*Gibson* v. *Hammang,* 63 Neb. 349, 352 (88 N. W. 500);
*Burwell* v. *Burwell,* 103 Va. 314, 316 (49 S. E. 68);
*Mackall* v. *Mackall,* 135 U. S. 167, 172 (34 L. Ed. 84,
10 Sup. Ct. Rep. 705). Plaintiff has failed to show
the existence of a fiduciary relation, and the burden of
proof is therefore upon her to establish the facts relied
on to set aside the deed.

11. This case is distinguished in important respects
from most of the authorities relied on by plaintiff.
Bridget M. Freeman did not strip herself of her prop-
erty; she reserved a life estate, the revenues of which
were adequate to her necessities. The importance of
this circumstance is emphasized in *Post* v. *Hagan,* 71
N. J. Eq. 234, 242 (65 Atl. 1026, 124 Am. St. Rep. 997),
and *Oliphant* v. *Liversidge,* 142 Ill. 160, 170 (30 N. E.
334). The deed was promptly placed of record and
immediately after Daniel E. Freeman got in com-
munication with plaintiff he advised her of its exist-

ence.   The circumstantial evidence is strongly against
plaintiff's contention that Daniel E. Freeman procured
the execution of the deed with the fraudulent purpose
of depriving plaintiff of her inheritance.   The fact is
that plaintiff had not been heard from for ten years;
she had dropped out of the life and thought of the
family.   The grantor in the deed was in good health
and of normal mentality at the time when the deed was
executed.   Mrs. H. A. Ehlers, a witness for plaintiff,
testifies, "she was bright enough for her age."   The
grantee was not living in the same house with the gran-
tor.   In view of the circumstances the deed was a nat-
ural one for the grantor to execute.   It is true that
the grantee employed the attorney who drew the deed.
This has been held to be a circumstance of but little
significance: *Teter* v. *Teter,* 59 W. Va. 449, 463 (53
S. E. 779).   It is probable that the deed was executed
at the suggestion or request of the grantee.   But this
does not constitute undue influence, nor does it in any
wise vitiate the conveyance: *In re Blair's Will,* 16
Daly, 540 (16 N. Y. Supp. 874, 876); *Doran* v. *McCon-
logue,* 150 Pa. St. 98, 116 (24 Atl. 357); *Schofield* v.
*Walker,* 58 Mich. 96, 106 (24 N. W. 624); *Yoe* v. *Mc-
Cord,* 74 Ill. 33, 44; *Teter* v. *Teter,* 59 W. Va. 449, 460
(53 S. E. 779).

"It is true that a court of equity is by the settled
law of this and other states required to, and it will,
scan a transaction of the kind here in question with
the utmost vigilance and scrutiny.   But that is an en-
tirely different thing from presuming the existence and
actual exertion of undue influence from the circum-
stances mentioned": *Slayback* v. *Witt,* 151 Ind. 376,
382 (50 N. E. 389).

12. No presumption of invalidity attaches to the deed
in question: *Sawyer* v. *White,* 122 Fed. 223, 225 (58

C. C. A. 587). Plaintiff has failed to prove the allegations on which she relies. The decree of the Circuit Court was right and it is affirmed.     Affirmed.

McBride, C. J., and Bean and Benson, JJ., concur.

---

Former opinion adhered to September 10, 1918.

## On Rehearing.

(174 Pac. 727.)

For appellant there was a brief over the name of *Messrs. Manning, Slater & Leonard,* with oral arguments by *Mr. John Manning* and *Mr. Woodson T. Slater.*

For respondents there was a brief over the names of *Mr. W. A. Harris* and *Messrs. Cake & Cake,* with oral arguments by *Mr. Harris* and *Mr. William M. Cake.*

BURNETT, J.—The plaintiff sued to set aside a deed by her mother to her brother, the defendant Daniel E. Freeman, and to have herself decreed to be the owner of an undivided third of the land included in the conveyance. Her suit was dismissed by the Circuit Court and the decree was affirmed by Mr. Justice McCamant's opinion reported in 172 Pac. 508. An able petition for rehearing was granted and the cause has been argued again.

13. The former opinion contains a sufficient statement of the facts. In the petition for rehearing the plaintiff strongly urges that our estimate of the power of attorney executed by the grantor in favor of Daniel E. Freeman was erroneous. It will be recalled that the evidence was that the mother had executed a deed

to the land in pursuance of an option given to some parties to purchase the same, which conveyance was deposited in escrow with a Portland bank. After the expiration of the option she sent another son to withdraw the deed, but the bank refused to surrender it without more definite authority from the mother, on account of which she executed the power of attorney in question in favor of Daniel E. Freeman, the defendant here, after consultation with other members of her family. The only use made of the instrument was to withdraw the deed, and the defendant explains that it was placed on record because it was contemplated that he might need it to perform some acts in his mother's interest relating to roads in Columbia County, as she was at the time a resident of Portland in Multnomah County. Looking at the matter in a common-sense view, under all the testimony respecting the relations of the parties, it is plain to any unprejudiced observer that the actual confidence of the mother in the son was neither increased nor diminished by the execution of this instrument. Equity looks at the substance of things, rather than at the mere writing evidencing the conventional relationship of the parties. Under these conditions, whatever importance might be attached to the power of attorney as a legal document while it was in force was obviated by its revocation, which the witnesses agree occurred immediately prior to the execution of the conveyance attacked in this suit. The technical effect of the power is overcome by the technical effect of its revocation and it must be disregarded as a controlling factor in the contention. Its value as conclusive evidence of a fiduciary relation with all its consequences, if that term is accurately apropos, began with its execution and ended with its revocation, however much we may con-

sider it with other circumstances disclosed by the evidence.

14. For all practical purposes, on the real merits of the controversy we have before us for consideration the validity of a deed from a parent to her child. It is strongly urged that the conveyance should be destroyed because the grantor did not have competent independent advice. There are many English authorities which, under the circumstances of each particular case, hold that the lack of independent advice would be a circumstance in aid of other features affecting a conveyance by one who is under the domination of another with whom the grantor sustains a confidential relation and to whom the transfer of title is made.

The leading case on that subject is *Huguenin* v. *Baseley,* 2 L. C. in Eq. 1156, 14 Ves. Jr. 273. In that instance a widow unaccustomed to business affairs became entitled to large estates in England and Jamaica. The defendant, a clergyman in whom she had great confidence and who seems to have been her spiritual adviser, insinuated himself into her good graces and induced her to withdraw her affairs from her solicitors and confer the sole management of her estates upon him. He used this confidence and his superior knowledge of the actual situation of her holdings to procure from her an interest in the property. Lord Chancellor Eldon commented on the fact that she did not have independent advice and used it as an argument to the effect that she did not fully understand and comprehend the effect of her dealings with the defendant. Summing up the whole matter after a discussion of that fact in connection with others appearing in the record, he said:

"Repeating, therefore, distinctly, that this court is not to undo voluntary deeds, I represent the question

thus : whether she executed these instruments not only voluntarily, but with that knowledge of all their effect, nature and consequences, which the defendant Baseley and the attorney were bound by their duty to communicate to her, before she was suffered to execute them; and though, perhaps,· they were not aware of the duties which this court required from them in the situation in which they stood, where the decision rests upon the ground of public utility, for the purpose of maintaining the principle, it is necessary to impute knowledge which the party may not actually have had.''

The essence of the discussion of the issue in that case is but a restatement in another form of the old rule, the substance of which is that if a grantor has sufficient reason and understanding to comprehend the nature, quality and consequences of the deed which he executes and the act is really his own and not virtually that of another who exercises undue influence over the grantor to that end, the deed is valid. *Huguenin* v. *Baseley* does not lay down the ·rule that independent advice must appear absolutely and at all events in every instance where the grantor may have special trust and confidence in the grantee, or where a fiduciary relation exists between the two.

In this country the Supreme Court of New Jersey comes nearer than any other to establishing an absolute rule that in such cases the grantor must have had independent advice. The leading case from that state is *Slack* v. *Rees,* 66 N. J. Eq. 447 (59 Atl. 466, 69 L. R. A. 393). There the grantor was sixty-eight years of age and long had suffered from *locomotor ataxia,* which affected both his mind and body. The deed in question was executed the day before his death. For nearly three months prior to that event he was an inmate of the home of his daughter, the grantee,

and was dependent upon her for the care and service which one in his condition constantly requires. The court found that the relation of the parties had become reversed, so that she was really his guardian. On the ground that the conveyance stripped the grantor of all his property and that he did not have independent advice respecting the execution of the instrument, the court set it aside.

Other cases from New Jersey are *Haydock* v. *Haydock's Exrs.*, 34 N. J. Eq. 575 (38 Am. Rep. 385), where the grantor was an old man devoid of mental capacity and clearly under the domination of his wife, without memory of what he had already done in the matter of conveyancing, and *Albert* v. *Haeberly*, 68 N. J. Eq. 664 (61 Atl. 380, 111 Am. St. Rep. 652), where the gift was by a girl to her stepmother, with whom she had lived since she was two years old, and the deed was made two months after the grantor became of age and while still a member of the grantee's family. It will be noted that this latter case is an instance of a gift from a child to one standing *in loco parentis*. In *Coffey* v. *Sullivan*, 63 N. J. Eq. 296 (49 Atl. 520) a grantor was in some degree enfeebled both mentally and physically and had not the benefit of independent advice. The grantee endeavored to keep the grantor away from others of the family and did many things to conceal the conveyance, and there were other elements of suspicion surrounding the transaction. In that case the court stated the rule in this more modified form:

"The burden of proof was cast upon the donee to establish that the donor fully appreciated what he was doing, *or* at all events, in the doing had the benefit of disinterested and competent advice."

New Jersey stands practically alone in this country in its treatment of the doctrine of independent advice. *Woodbury* v. *Woodbury,* 141 Mass. 329 (5 N. E. 275, 55 Am. Rep. 479), is an authority for submitting the lack of advice as a circumstance to be considered by the jury. The rule is thus stated in the alternative in *Hensan* v. *Cooksey,* 237 Ill. 620, 626 (86 N. E. 1107, 127 Am. St. Rep. 345), cited by the plaintiff:

"The existence of the confidential relation creates a presumption of influence, which imposes upon the one receiving the benefit the burden of proving the absence of undue influence by showing that the other party acted upon the competent and independent advice of another, or such facts as will satisfy the court that the dealing was at arm's-length, or that the transaction was had in the most perfect good faith on his part and was equitable and just between the parties; or, as some of the authorities say, that it was beneficial to the other party."

In *Gibson* v. *Hammang,* 63 Neb. 349 (88 N. W. 500), noted in plaintiff's brief, the grantor was seventy-eight years old and much enfeebled by illness. The grantee, a daughter, was very importunate, made railing accusations against her brothers and sisters, represented that they were about to have a guardian appointed for the grantor, her mother, concealed the project from a brother living in the same house and from others of the family, especially a sister living near. In *Disch* v. *Timm,* 101 Wis. 179 (77 N. W. 196), a husband conveyed property to his third wife through her son-in-law. The grantor was enfeebled by cancer of the stomach and under the influence of opiates and other sedatives. The grantee had divorced two former husbands, kept a saloon and was of a domineering disposition. The son-in-law prepared both deeds, one to himself and the other from himself to the

grantor's wife. She and her children virtually made the grantor's children leave home, although the latter were always on good terms with the grantor and attentive to him; prevented all private communication between him and them and kept the deeds a secret until the day after the death of the grantor, when they recorded them. In practically all of the cases cited as precedents by the plaintiff there was evidence of pronounced mental weakness on the part of the grantor, coupled with the circumstance that the grantee used the confidential relation for the purpose of unduly influencing the grantor and was likewise guilty of deceit and concealment.

In treating of transactions between parties between whom a fiduciary relation exists, the rule is thus stated in 2 Pom. Eq. Jur. (3 ed.), Section 958:

"There is, however, no imperative rule of equity that a transaction between the parties is necessarily, in every instance, voidable. It is possible for the trustee to overcome the presumption of invalidity. If the trustee can show, by unimpeachable and convincing evidence, that the beneficiary, being *sui juris,* had full information and complete understanding of all the facts concerning the property and the transaction itself, and the person with whom he was dealing, and gave a perfectly free consent, and that the price paid was fair and adequate, and that he made to the beneficiary a perfectly honest and complete disclosure of all the knowledge or information concerning the property possessed by himself, or which he might, with reasonable diligence, have possessed, and that he has obtained no undue or inequitable advantage, and especially if it appears that the beneficiary acted in the transaction upon the independent information and advice of some intelligent third person, competent to give such advice, then the transaction will be sustained by a court of equity."

In succeeding sections the learned author relaxes the rule somewhat as between principal and agent, emphasizes it with reference to guardian and ward, and when he comes to the relation between parent and child, in Section 962, he uses this language:

"Transactions between parent and child may proceed upon arrangement between them for the settlement of property or of their rights in property in which they are interested. In such cases courts of equity regard the transactions with favor. They do not minutely weigh the considerations on one side or the other. Even ignorance of rights, if equal on both sides, may not avail to impeach the transaction. * * Where the positions of the two parties are reversed, where the parent is aged, infirm or otherwise in a condition of dependence upon his own child, and the child occupies a corresponding relation of authority, conveyances conferring benefits upon the child may be set aside. Cases of this kind plainly turn upon the exercise of actual undue influence, and not upon any presumption of invalidity; a gift from parent to child is certainly not presumed to be invalid."

From these excerpts it is plain that the text-writer does not make independent advice a *sine qua non* the absence of which alone will vitiate a conveyance, at least from parent to child. A well-considered case on this subject is *Zimmerman* v. *Frushour,* 108 Md. 115 (69 Atl. 796, 15 Ann. Cas. 1128, 16 L. R. A. (N. S.) 1087). In that case the grantor had lived as a housekeeper in the family of the grantee's parents from his birth continuously to the time he was married, after which she lived in his household. She had nursed him from babyhood and thought as much of him as if he were her own child. When he came to manhood she intrusted to his keeping all her money and other property and relied upon him for advice and direction in all her business transactions. A more complete case

of confidential relation could hardly be made out. The court reviewed the English and American precedents at great length and reached the conclusion that it is not essential in all cases for the donor to have independent advice before making a gift to one in whom he has extreme confidence. The annotator in the L. R. A. report of the case thus states the result of his examination of the authorities:

"That the question whether or not such advice was given is a material one, to be considered with other surrounding facts and circumstances, such as the nature and purpose of the gift and the condition and the relation of the parties, is readily conceded by all courts. That the donor had independent advice relating to the gift is generally recognized as a strong circumstance rebutting the presumption of undue influence that might be raised by reason of the relation of the parties. It is equally true that the failure of the donor to secure independent advice may tend strongly to show undue influence, especially if such failure was due to the persuasion or conduct of the donee. It is not, however, generally held that a necessary condition of a valid gift between parties occupying confidential relations toward each other is the interposition and advice of a third person in behalf of the donor."

Even in New Jersey, in the case of *James* v. *Aller,* 68 N. J. Eq. 666 (62 Atl. 427, 111 Am. St. Rep. 654, 6 Ann. Cas. 430, 2 L. R. A. (N. S.) 285), the court found no difficulty in sustaining a gift of substantially all his property by a father to his daughter on the eve of his second marriage, although it did not appear that he had independent advice concerning the transaction. Again, in *Groff* v. *Stitzer,* 75 N. J. Eq. 452 (72 Atl. 970), the court held in substance that where the grantor does not dispose of all his property the doctrine of "independent advice" does not apply in all

its force as taught in such cases as *Slack* v. *Rees,* 66 N. J. Eq. 447 (59 Atl. 466, 69 L. R. A. 393), and *Post* v. *Hagan,* 71 N. J. Eq. 234 (65 Atl. 1026, 124 Am. St. Rep. 997). In *Soper* v. *Cisco,* 85 N. J. Eq. 165 (95 Atl. 1016, Ann. Cas. 1918B, 452), the mother grantor had lived with and depended upon the daughter grantee, and conveyed the property, one tract for $50 and the other for $300 and "support during her natural life." The latter tract was worth about $5,000. No effort was made to conceal the transaction nor to keep the grantor from seeing other children and advisers. She was seventy-seven years of age and of usual health of body and mind, and lived with the daughter for sixteen years after the deed was made, when she became dissatisfied at necessary restraint placed upon her owing to her then enfeebled mental condition, and left, bringing the suit to set aside the deeds. The court held:

"That the bargain was a natural and provident one for the mother to make and was not the product of undue influence, and will not be set aside for failure to show that the mother had independent advice."

In that case the court laid down this maxim:

"The test of mental capacity to make a deed is that a person shall have ability to understand the nature and effect of the act in which he is engaged and the business which he is transacting."

*Ralston* v. *Turpin,* 25 Fed. 7, is a case where the effort was to set aside certain deeds of gift made to the respondent by the husband of the complainant, who claimed as his widow. The grantee in the conveyance had been an intimate friend of the grantor's family, had acted for his mother in a fiduciary capacity, had been guardian of the grantor and later on, after

89 Or.—29

the latter attained majority, had acted as his general agent under power of attorney. The deed was to the grantee as trustee for his own children and was designed as a bounty for the *cestuis que trustent.* Quoting from the syllabus, it was held:

"A gift by a principal to an agent is valid, unless the party who seeks to set it aside can show that some advantage was taken by the .agent of the relation in which he stood to the donor. If it appears that the conduct of the agent is fair, honest, and *bona fide,* it is immaterial that the deed of gift may have been drawn up by his solicitor without the intervention of a third party."

This case was affirmed on appeal to the Supreme Court of the United States in *Ralston* v. *Turpin,* 129 U. S. 663 (32 L. Ed. 747, 9 Sup. Ct. Rep. 420). Appended to the report of the case in 25 Federal Reporter is a valuable note differentiating two classes of confidential relations. In brief, the distinction is between such relations as guardian and ward, trustee and *cestui que trust* on the one hand, and principal and agent, parent and child and such like on the other, the reason for the difference being that in the first class the trustee or guardian has authority over the property of the beneficiary which cannot be revoked at the pleasure of the latter, whereas in the other relations mentioned there is no irrevocable authority over the property of the beneficiary, but he is at liberty to terminate the power at pleasure. The annotator reviews many authorities and contrasts *Huguenin* v. *Baseley* with *Hunter* v. *Atkins,* 3 Mylne & K. 134, which latter concerned a gift by a client to his solicitor, which was sustained. In *Carney* v. *Carney,* 196 Pa. St. 34 (46 Atl. 264), it was held that a child may accept a gift from his parent without being obliged to show that the grantor was

free from undue influence or that the conveyance was fair, and the want of independent advice was held to be no obstacle to the transaction. In *Naeseth* v. *Hommedal,* 109 Minn. 153 (123 N. W. 287), the want of independent advice was considered only as a circumstance in connection with other features.

According to the great weight of authority, it is not reasonable to hold that because A has confidence in and trusts B the former is under such disability that he cannot give the latter anything unless he is able to, and does, find some stranger who will advise the execution of the gift. The circumstance of want of independent advice is nearly always found as an auxiliary or makeweight to a decision where there is a defect of mental capacity or other conditions which of themselves tend to nullify the questioned transaction. Aside from the New Jersey precedents, which are weakened by other decisions of the same court, there is no well-considered case in this country which holds that such counsel is a *sine qua non* like the writings required by the statute of frauds or the production of more than one witness to prove usage or treason.

15. The essence of the charge against the defendant is that without any authority or direction from his mother and without her knowledge or consent the grantee procured an attorney to prepare a deed conveying the legal title from his mother to him, which he reported to her was a lease of the premises; that he did not read it to her or clearly explain to her the legal effect thereof, but told her that it was a lease, and on account of her confidence in him she relied upon his word, being illiterate and unable to read the instrument. The only direct testimony on this subject is that of the defendant grantor, who says that his mother directed him to have such a deed drawn, in pur-

suance of which instruction he had an attorney prepare the same and send it to him, after which he read it in full to his mother. She, herself, had several days prior thereto talked to the disinterested witness Watts about such a method of disposing of her property when he informed her that a like procedure had been adopted in his own family before that time. At the immediate execution of the instrument he told her that it was a deed with a life lease in it. She was then in her usual health, and the principal witness for the plaintiff, Mrs. Ehlers, says in substance that the old lady was mentally as well as ever.

The complaint does not charge mental incapacity of the grantor beyond what may be implied from her illiteracy. The gist of the accusation is that the grantee reported the instrument to be a lease when in fact it was a deed. There is utterly no testimony whatever in the record tending to show that the defendant grantee made any such representation to his mother. On the contrary, his testimony is to the effect that he read the instrument to her at large and explained its meaning. That she understood the effect of the instrument is corroborated by the testimony of Watts, in substance, that he stated to her what it was and that she had previously talked to him on that subject.

Undue influence is made an incident of the plaintiff's case by the following averment of her complaint:

"And because of her said confidence and trust in her son and by his undue influence and persuasion, upon her, she did not protest against his following acts respecting a pretended execution of said deed: That thereafter said defendant took his mother to the store of J. G. Watts in Scappoose, Oregon, who was a notary public, and there without reading or further explaining said instrument to her, and in the presence of said notary, himself wrote his mother's name at

the foot of said pretended deed and caused her to make her mark thereupon near where he had written her name. * * ''

The only other acts of the defendant there averred being his request that the notary certify the acknowledgment of the deed and that the grantee filed it for record. Beyond controversy, the notary, not the defendant, wrote the grantor's name and she held the top of the penholder as her mark was made, all after the officer had explained to her that the writing was ''a deed with a life lease in it.'' It is not necessary, however, to rest the conclusion of this branch of the case on the contradiction of the plaintiff's allegation by the testimony. It may be conceded that the defendant's relation to his mother was more intimate than that of the plaintiff and that he enjoyed his parent's confidence more than any other person. That is the most the plaintiff has proved, yet that does not of itself establish fraud or undue influence.

In *Sawyer* v. *White,* 122 Fed. 223 (58 C. C. A. 587), the plaintiff attacked a deed to the defendant executed by the latter's father, a paralytic eighty-eight years of age. It was averred that the grantor had not sufficient mental capacity to execute the conveyance, that the grantee was the confidential adviser and the manager of the property of the grantor and that he procured the deed by undue influence. The opinion of Mr. Justice Sanborn on that point contains this language:

''There is no doubt that he was influenced to do so by his affection for and confidence in his son and by his gratitude to him for his years of devotion and service. But hatred or indifference is not indispensable to the validity of a gift, nor is gratitude or affection for the grantee fatal to it. * *

The natural influence of the affection of a parent for a child is neither fraudulent nor illegal. * * Nor is the fact that the grantee or devisee occupies a fiduciary relation to his grantor or testator necessarily fatal to the gift. It is the use of that relation to secure a deed or devise against the free will or desire of the grantor or donor, and not the mere existence of the relation, that vitiates a grant. It is true that when an unnatural or unreasonable gift or devise is made—such as one by a ward to his guardian, or by a helpless invalid to his nurse, or by a client to his trusted attorney—the presumption at once arises that the fiduciary relation was used to overcome the will of the grantor and that the deed or devise is voidable. But when the natural gift of a parent to a loved and trusted child is in question, this presumption is met and overcome by the still stronger presumption that such a gift is the natural and reasonable act of the parent, and that the free will of the donor inspired the grant, uninfluenced by the trust relation.''

In *Nicholson* v. *Duff*, 189 Mo. App. 47 (174 S. W. 451), a transaction was upheld where the donor at the age of seventy-five years gave to her daughter a promissory note of a large amount and the transaction was held not to be affected by the fact that the daughter was caring for her mother, accompanied her to the bank where the mother got the note and to a lawyer, before whom the mother assigned it to her as a gift. It was held also that all these circumstances raised no presumption of confidential relation or undue influence: See, also, *Towson* v. *Moore,* 173 U. S. 17 (43 L. Ed. 597, 19 Sup. Ct. Rep. 332); *Bonsal* v. *Randall,* 192 Mo. 525 (91 S. W. 475, 111 Am. St. Rep. 528); *Mallow* v. *Walker,* 115 Iowa, 238 (88 N. W. 452, 91 Am. St. Rep. 158); *McFarland* v. *Brown* (Mo.), 193 S. W. 800; *Sappingfield* v. *Sappingfield,* 67 Or. 156 (135 Pac. 333); *Tenbrook* v. *Brown,* 17 Ind. 410; *Teegarden* v.

*Lewis,* 145 Ind. 98 (40 N. E. 1047, 44 N. E. 9) ; *Kennedy* v. *McCann,* 101 Md. 643 (61 Atl. 625) ; *Prescott* v. *Johnson,* 91 Minn. 273 (97 N. W. 891) ; *Burwell* v. *Burwell,* 103 Va. 314 (49 S. E. 68) ; *Turner* v. *Gumbert,* 19 Idaho, 339 (114 Pac. 33).

What, then, is the situation with which the grantor was confronted? All her children, except three, were in fact dead. Her daughter Carrie, a spinster, was as good as dead from the ravages of tuberculosis and succumbed to that disease within two months after the execution of the deed. The plaintiff had gone away to parts unknown and had not been heard of for more than ten years. Under such circumstances the presumption of law is that she was dead also: Section 799, subd. 26, L. O. L. If we may credit Mrs. Ehlers, the principal witness for the plaintiff, after the death of Carrie the old lady said that she had buried all her children except one. This indicates the legitimate attitude of her mind in the premises. It was thus naturally apparent to the mother when she made the deed that she had but two living children and one of them was even then almost *in articulo mortis.* The defendant had remained near his mother and given her the attention of a dutiful son. They had always lived apart, so that she was as independent of him as any other parent would be of an attentive child. It was natural that the mother would want him to have the farm upon which he had worked so long. She did not strip herself of the entire property, as appears in almost every case cited by the plaintiff. On the contrary, she reserved the use of all of it during her life. No effort was made on behalf of the defendant to keep her away from the plaintiff or from those who would give her independent advice. She knew all about the situation, and the natural objects of her bounty, as

well as he did. There is no evidence of concealment by the defendant of anything that would in the least affect the transaction. There is nothing to dispute the testimony of the defendant and those present at the execution of the instrument. All that is shown in opposition is that the defendant had the opportunity to act as the plaintiff charges he did. The law comes to his aid in that state of affairs and in addition to his own and other testimony presumes him innocent of wrong and that the transaction in question is fair and regular: Section 799, subds. 1, 19, L. O. L. Under the circumstances, it was a natural disposition for the mother to make of her property, to give it to the only one of her family who seemed at all likely to survive her, so far as she knew. In the language of the Code the presumptions noted above are satisfactory and they are sufficient to turn the scale in favor of the defendant, even on the theory that the burden of proof devolves upon him. The conveyance thus appears to be the legitimate and normal result of the ordinary relation of parent and child. The conclusion is the more satisfactory because it follows that of the trial judge, who heard and saw the witnesses, and it ought not to be disturbed at the suit of the daughter who utterly neglected her mother for more than a decade and emerged from the obscurity she had drawn around herself only after death had claimed the parent and her property became available. We adhere to the former opinion. FORMER OPINION ADHERED TO.